*256 The opinion of the Court (Parker C. J. dissenting) xvas read at February term 1823, as drawn up by
Wilde J.
The error assigned in this case depends on the second section of the statute of 1811, c. 6. That this section is not repugnant to the principles of the constitution was determined in the case of Adams v. Howe & al., 14 Mass. Rep 340. Whether it is a wise and salutary provision or not is a question for the consideration of the legislature, and not within the province of this Court to determine. If the statute be constitutional, the Court have only to declare the law according to the apparent meaning of the legislature. What, then, is the true construction of this section of the statute i It provides, that “whenever any person shall become a "member of any religious society, corporate or unincorporate, within this Commonwealth, such membership shall be certified by a committee of such society, chosen for this purpose, and filed with the clerk of the town where he dwells, such person shall for ever afterwards be exempted from taxation for the support of public worship and public teachers of religion in every other religious corporation whatsoever, so long as he shall continue such membership.”
The plaintiff claims to be exempted from taxation in The First Parish in Braintree, where he resides, he having, before the assessment of the tax complained of, joined a religious and incorporated society in an adjoining town, and having produced and filed with the clerk of the town of Braintree a certificate thereof from a committee of the society, conformably to the statute. The objection made to this claim is, that the religious society of which the plaintiff became a member, and the parish in which he resides, are of the same denomination of Christians, and that the Si. 1811, c. 6, was not intended to apply to persons withdrawing from one religious society or corporation to join another of the same denomination.
To determine this point it does not appear to me necessary to look beyond the second section of the statute. This contains a provision independent of, and in addition to, the one contained in the constitution and enlarged by the first section of the act. The lánguage of the second section is clear and unambiguous ; so that if the plain and obvious import of the *257 words is to be regarded as conclusive, the plaintiff is certainly exempted from taxation for the support of public worship “ in every religious corporation whatsoever,” excepting the one of which he is a member. When the words of a statute are clear and unequivocal, the rules of construction established for doubtful cases are not applicable, and it appears to me that the words of this section of the statute are so explicit as to leave no room for construction.
This can hardly be doubted, if the second section be considered independent of the other sections of the statute. If thus considered, I apprehend no one could raise a question as to the true meaning of the legislature. But the Court do not decide the case upon this limited ground. When the meaning of any particular section or clause of a statute is questioned, it is proper, no doubt, to look into the other parts of the statute ; otherwise the different sections of the same statute might be so construed as to be repugnant, and the intention of the legislature might be defeated. And if, upon examination, the general meaning and object of the statute should be found inconsistent with the literal import of any particular clause or section, such clause or section must, if possible, be construed according to the spirit of the act. But to warrant the application of this rule, the intention of the legislature must be clear and manifest. The question then is, whether the intention of the legislature is so plainly expressed, in other parts of the statute, as to limit and restrain the general words used in the second section. If this intention is expressed at all, it must be discovered by the preamble or the first section.
As to the preamble, it recites merely a clause of the constitution, which is enlarged by the first section. It does not point to the third and fourth sections, nor, as I can perceive, to the second, which is an independent provision, not founded on the recited clause of the constitution. It is said in the case of Mace v. Cammel, Lofft, 782, “ That though the preamble be generally a key to the statute, yet it does not always open all parts of it ; but sometimes the legislature having a particular mischief in view, to prevent which was the first and immediate object of the statute, recites that in the preamble, and then goes on in the body of the act to provide a remedy for general mis *258 chiefs, of the same nature, but of different species, not ex' Pressed in the preamble, nor perhaps then in contemplation.” Chief Justice Willes also says, in the case o Colehan v. Cooke Willes, 395, “ If the words of an act of parliament be doubtful, it may be proper to have recourse tó the preamble to find out the meaning of the legislature ; but where the words of the enacting part are plain and express, I do not think that they ought to be restrained by the preamble ; for the preamble may only recite some particular mischiefs which have happened, but the enacting clause may not only be calculated to prevent those mischiefs, but others also of a like nature.” This is undoubtedly true, and might be demonstrated by reference to very many statutes, in which it will be found that the preamble states imperfectly the views of the legislature, and can afford but little aid in the construction of the enacting parts. It is not unfrequently merely introductory to the first section, and it appears to me it was so used in the statute under consideration, and that it applies to no parts of the statute except the first section.
But it has been argued, that the views of the legislature, as expressed in the first section, are to be considered as manifesting the limited sense in which the second section is to be understood. I have not, however, been able to satisfy myself that such was the intention of the legislature. If it had been, no good reason can be given why the words of limitation made use of in the first section should have been omitted in the second. It cannot be supposed that so important an omission could have been carelessly overlooked, when we recollect the interest and the opposition the subject excited in the minds, not only of the legislature, but of the community. These words of limitation were first used in the constitution, and were repeated in the St. 1799, c. 87, § 4. With these provisions, together with the preamble and first section of the act of 1811 before them, it seems impossible to believe that the legislature could have omitted these words in the second section by mistake.
The first section provides only for the appropriation of the money after the assessment and the collection of the tax. Neither by this provision, nor by the law of 1799, nor by the constitution, is any one exempted from taxation for the support *259 of public worship. No such exemption seems to have been contemplated by the framers of the constitution, who manifestly intended that every one should be held to contribute according to his ability to the support of public worship, upon the institution and maintenance of which the happiness of the people, and the good order and preservation of civil government, so essentially depend. But there being no restraining clause in the constitution, the legislature in the plentitude of their power have in the second section provided for this exemption; and, as it seems, on the condition only, that the person claiming it shall become a member of some religious society, and shall produce a certificate of his membership to be filed with the town clerk. This religious society may be composed of Christians, or of Jews, Mahometans, or Pagans. It is not required to support any teacher of piety, religion, and morality; and the person claiming exemption is not obliged to attend public war ship as the condition of this privilege. This is the plain and necessary construction of this section, and so it seems to have been considered in the case of Adams v. Howe & al. The constitutional objection, in that case, depended upon it altogether ; and although the Court overruled the objection, they do not intimate an opinion that this is not the true construction of the statute ; on the contrary, it is said that the legislature nave not required, as essential to an exemption, that there should be any minister at all, but only a society, and a committee. 14 Mass. Rep. 350. If this be true, and I think it is, then clearly the limitations and restrictions contained in the first section are not to be extended to the second ; for by the first section, no man’s tax can be drawn from the treasury, unless he usually attends the instructions of some teacher of teligion, and such teacher only is entitled to claim the money.
I am well aware of the evils which may be apprehended from this construction of the statute; but the legislature, and the legislature alone, can guard against them. It would have been better, undoubtedly, if they had been removed altogether by some constitutional provision. I should, however, make no objection to the law of 1811, if it were so modified as to require every one to contribute, according to his ability, towards the support of public worship. The want a <=ome such pro *260 vision is the great defect of the law; for I do not entertain the apprehensions which some do, with respect to the question directly involved in this case.
The plaintiff does not ask for relief from the burden of supporting public worship; he does not claim to be exempted from taxation. Having become a member of a regular incorporated religious society, he is taxed there for the support of the teacher on whose instructions he attends.' All he requires is, to be relieved from a tax for the support of a teacher on whose instructions he does not attend, and from which he derives no benefit; in short, he objects to being doubly taxed Now I can perceive nothing in this unreasonable, or incon sistent with the public good or the spirit of the constitution. To compel a man to attend public worship where he is dissatisfied with the minister or teacher is not likely to be profitable either for instruction or moral improvement; and to compel him to contribute to the support of a minister or teacher, upon whose instructions he cannot attend with satisfaction and edification, is unreasonable.
The privilege of withdrawing from one religious society and of joining another, whether of the same or of a different denomination, has always been enjoyed within the limits of some of our large towns, and I have never heard of any evils arising from this indulgence. Why so important a privilege should be restrained by town lines, I am at a loss to understand. To prevent or discourage those from uniting together in public worship who unite in religious opinions, cannot serve to promote the cause of religion, or the harmony of our churches On the contrary, I fear it would tend only to promote discon tents, and to check the progress of religious improvement.
If a man may withdraw from a parish or religious society because he is of a different sect or denomination, that is, because he differs from that parish or society as to forms of worship or church discipline, a fortiori ought he to be allowed so to do, when the difference of opinion touches the most interesting and essential doctrines of Christianity.
These considerations could not have escaped the attention of the legislature of 1811; and that they were disposed'rather to extend, than to limit our religious privileges, cannot, I appre *261 hendj be doubted. I cannot, therefore, adopt a construction of the second section, which appears to me opposed to the manifest intention of the legislature.
For these reasons, I am of opinion that the judgment of the Circuit Court of Common Pleas is erroneous, and a majority of the Court concur in this opinion.
Parker C. J
wrote his opinion as follows : —
The plaintiff being an inhabitant of The First Parish in Brain-tree, was liable to be assessed to the ministerial tax of that parish, unless he is exempted by some statute of the government.
He claims an exemption by virtue of the statute respecting public worship and religious freedom, passed in the year 1811. It appearing that he had obtained and filed the certificate required by that act, showing that he attended public worship in another religious society which is of the same denomination with the parish within which he lived, the assessment of which he complains was not lawful, if the statute by a reasonable con struction shall be held to extend to cases like his.
It is proper to consider the constitutional and legislative provisions on this subject, in order to ascertain the intent and meaning of the legislature in the particular statute in question.
For statutes are not to be taken according to their very words, but their provisions may be extended beyond, or restrained within the words, according to the sense and meaning of the legislature apparent from the whole of the statute, or from other statutes enacted before and after the one in question The general system of legislation upon the subject matter may be taken into view, to aid the construction of any one statute relating to the same subject.
The basis of all our provisions on the subject of the public worship of God is to be found in the third article of the declaration of rights, prefixed to the constitution. This article is an expression of the sense of the people of the importance of the subject, and of their will that the legislature should from time to time enact such laws as would be likely to promote so valuable an end. The two great objects intended to be secured were the support, by religious corporations, of public teachers of piety, religion and morality, ana ent re liberty of conscience for all the citizens.
*262 These objects were supposed to be attained by enjoining upon the legislature the duty of exacting of all religious corporations the maintenance of public worship, and by providing that each citizen, who had been obliged to contribute his money to this object, should have liberty to appropriate it towards the support of the teacher of his own sect or denomination, provided he attended upon any one who differed in this respect from the parish of which such citizen was an inhabitant.
This latter provision of the declaration of rights was, until within a few years past, carried into effect only by an action in the name of the minister or teacher of the parish or society to which the dissenting member had attached himself; and it was uniformly held, that a difference of denomination was necessary to be proved, in order to support such action. Thus, until the year 1800, all the inhabitants of a parish were considered as members of the religious society, and were assessed in the parochial taxes ; but those who actually belonged to another society of a different denomination were secured in their rights of conscience in the manner before stated.
Quakers had been exempted from taxation, before the adop tian of the constitution, by law, and after its adoption, practically, if not by express legislative provision, they were allowed the same privilege.
Without doubt it was competent for the legislature to enlarge the privileges of the citizens beyond the provisions of the bill of rights, for it does not appear to have been the intent of the people to restrain its power in this respect ; but until the year 1800, a period of twenty years from the adoption of the constitution, no legislative interference was thought necessary.
In that year a statute was enacted, (St. 1799, c. 87,) the principal objects of which seem to have been to give legislative sanction to the third article of the bill of rights and provide for its due execution ; and to prescribe the mode in which the taxes of those, who were of a different denomination from the parish, should be paid to the support of their own minister. In this statute there was authority given to the assessors to omit from the taxes, if they saw fit, those persons who produced the prescribed evidence of their belonging to a society of a different sect, to avoid the inconvenience of taxing them, and, after *263 the tax was collected, having it withdrawn from the treasury. This privilege, as well of drawing out the amount of these taxes, as of being exempted from taxation, was confined to those should actuary belong to a different denomination, and in this respect the statute conformed precisely to the provisions in the third article of the declaration of rights.
Thus stood the law until the year 1811, and it will be well tc consider what were the supposed mischiefs which induced the legislature to interpose their authority at that time.
Having no reports of judicial decisions prior to the year 1804, we have lost an important part of our history in relation to the construction of the constitution and the declaration of rights, but we have a traditionary account that it was early decided, that difference of denomination, as the term is used m the declaration, consists in a difference of church discipline and mode of administering some of the Christian ordinances ; not in difference of opinion on doctrines of theology. Episcopalians, Congregationalists, Presbyterians, Baptists and others were each of different denominations, but Christians belonging to either of those sects were of the same denomination, however widely they might differ as to the essential or non-essential matters of faith or doctrine. This is still understood to be the characteristic of a sect or denomination ; -hence we find much diversity of opinion among Christians of the same sect or denomination, who agree in their mode of church government and in the manner of administering the sacred ordinances. This singularity does not seem ever to have been the ground of complaint or of application to the legislature for relief.
Another point which arose for judicial consideration related lo the question, whether, to entitle a person to withdraw his taxes from the town or parish treasury, such person being of a different denomination from that of the society in which he was taxed, it was necessary that the minister on whose services he attended should be the minister or teacher of an incorporated religious society. It is said that different decisions bad taken place in regard to this question. But we have no account of any judicial decision of it until the case of Barnes v. The First Parish of Falmouth, reported in 6 Mass. Rep. 401. In this ease it was decided, that only a minister of a public inCOrpOrat *264 ed religious society was within the meaning of the declaration rights ; and it is impossible for any one, who has read the elaborate opinion of Chief Justice Parsons in that case, to doubt that this was a just construction of that instrument.
Nevertheless, it is well known that the promulgation of that opinion produced great uneasiness among several sects of Christians throughout the Commonwealth, and that numerous petitions were presented to the legislature for relief from the supposed grievance it occasioned. The decision was pronounced in May 1810, and in the first session of the legislature which was chosen by the people after that decision, the statute was enacted which has ever since borne the name of the Religious Freedom Act, which is the act under which the plaintiff claims his exemption from taxes in the parish where he resides.
It may be supposed that the act passed in conformity with what was thought to be the popular wish at the time ; and as that wish was limited to an abolition of the distinction until then existing between corporate and unincorporated societies, that the legislature would not be likely to extend the provisions of the act beyond that object. The preamble of the act re cites the third article of the declaration of rights, in so far as it establishes an equality of immunities between the different denominations, and the first section pursues the declaration without any deviation except for the purpose of applying its provisions to unincorporated religious societies.
The second section seems to keep in view the same leading object for another purpose than that which was secured by the first, which merely extended the privilege of drawing out taxes to those of unincorporated societies ; so that by virtue of this first section a different denomination still remained necessary to entitle the party to that privilege ; nor is there any other part of the act which authorizes a suit for taxes paid without that circumstance.
I admit, if the second section stood alone as the whole statute, the terms of it are broad enough to comprehend the plaintiff’s case, and that the difference of denominations would be entirely abolished in respect to the privileges intended to-be secured by the statute. But I have always understood that it was right and proper to consider the whole of a statute and *265 .lie preamble, and the probable intention of the legislature, in order to ascertain the meaning of any particular section; and that this mode of interpretation is justifiable, even where the words of the section itself may be unambiguous. Certainly, if one section, however explicit its terms, if taken literally, would contravene the general object of the statute, it should be restrained so as to conform to that object. So also, I think, if one section should be much more extensive in its operation, than the general scope and object of the statute, it may be restrained in its construction within that scope. Now it ought to be supposed that the legislature, in any statute relating to the important subject of public worship, would depart as little as possible from the will of the people as expressed in the declaration of rights, and as that instrument manifestly recommended, if it did not enjoin, that all of the same denomination should be liable to contribution for the support of the minister of the parish in which they lived, the legislature ought not to be deemed to have adopted a different principle but upon the most clear and unequivocal expression of its will in that re spect. I do not think it is so expressed in the statute under consideration, because it is clear that another and different object was principally, if not solely, in view when the statute was enacted, and because the second section may well have reference to that object, and may be perfect in its provisions and applications without extending it beyond. The first section merely provides for the appropriation of the money of a dissenting parishioner to the use of his own minister, whether he belongs to an incorporated or unincorporated society. It is evident that this first section alone did not afford all the relief that was prayed for by those who alleged that they were aggrieved, or, if it did, the mode of obtaining the relief might be expensive and troublesome to the party complaining, as well as inconvenient to the officers of the parish, who would be obliged to assess taxes, and collect them subject to the pleasure of the party taxed to draw out his proportion ; a process which would be likely to embarrass the fiscal concerns of the parish without any equivalent advantage.
The object of the second section, therefore, was to save this expense and trouble, by exempting from taxation those who *266 by the former section were entitled to withdraw their taxes, upon their taking such measures as would signify to the parisn officers, that they actually belonged to another society; which, it strikes me, should be of the same character as was contemplated in the first section, viz. of a different religious denomination.
The use of the terms corporate and unincorporate in the second section clearly, to my mind, evinces, that the legislature was only providing for the same object which they had in view in the first.
Furthermore, I should think it remarkable, that the legislature, setting out with a limited object, and providing for one mode of carrying it into execution, in the first section of a statute, should, in another, without an express declaration of other objects intended to be affected, by the use of general terms only, be held to have abolished distinctions, which, until x the statute passed, were known, practised upon, and enforced without any complaint or application for relief. The mischief supposed to exist, and which the legislature professed to cure, was, that Christians of particular denominations were debarred from a constitutional privilege, because they did not belong to an incorporated society; but the statute, besides applying this relief, is supposed to have rendered it wholly unnecessary, by breaking down the distinction of sects altogether, in providing for an exemption from taxes.
Another thing strikes me as singular, if the second section of the statute should receive the construction contended for, which is, that the privileges secured by both sections of the statute do not apply equally to Christians of the same and those of a different denomination. Under the first section it is clear that the former have no rights, but only under the second ; that is, if taxed, they cannot withdraw their money in the manner therein provided, though they may by taking the proper measures be wholly exempted; whereas those of a different denomination from the parish enjoy the privilege given by both sections of the statute.
I think, also, a strong, though a silent commentary upon the statute, is furnished by the absence of all attempts to have it executed, as now proposed, from the time it passed until the *267 so nmencement of this suit; notwithstanding it is notorious, that in many, if not most, Congregational parishes, there are some who differ from the prevailing tenets as jealously as the various denominations differ from each other, and would have been quite as ready to dissolve their connection with the society of which they are members, as the different sects have been to sever from each other. No doubt, the discussions in the late convention produced this question, but nothing can be inferred from what took place there, except that a majority was desirous to amend the declaration of rights, so as to meet the very case supposed to have been before provided for by the statute. I cannot but think, if the legislature intended to introduce so important a change as is supposed to have been effected by the statute of 1811, they would, in express terms, in the second section, have abolished the distinction of denominations, as they did that of incorporated and voluntary societies.
Upon these considerations 1 have come to the conclusion, that the plaintiff in error, not being of a different denomination from that of the parish within which he lived, is not, because he chose to attend public worship in another society of the same denomination, exempted from taxation in the parish.
I think I have not been influenced by any apprehensions of the injurious effect of a different determination, for I do not know whether it would be expedient, or inexpedient, to destroy what remains of the obligations of citizens to contribute to the support of public worship by the corporations of which they are members. Perhaps so much has been done, that to do the rest will do no harm. At any rate, the legislature is to judge of this, and whenever it shall express its will in clear and unequivocal terms, I shall very readily submit.

Per Curiam.

The judgment must be reversed, and a venire de nova awarded.[1]

 See St 1823, c 106; Whittemore v. Smith, 17 Mass. R. 347; Coburn v. Richardson, 16 Mass. R. 213; Gage v. Currier, 4 Pick. 399; Sumner v. First Parish in Dorchester, 4 Pick. 361; Lord v. Chamberlain, 2 Greenl. 67.